In the Matter of R.L.S. and C.E.S., alleged deprived children.

The STATE of Oklahoma, Appellants,

v.

Robin STONECIPHER, Appellee.

No. 81609.

Court of Appeals of Oklahoma, Division No. 4.

June 28, 1994.

___

J. Tully McCoy, Dist. Atty., Lee Cate, Asst. Dist. Atty., Norman, for appellant.

Eric H. Hermansen, Oklahoma City, for appellee.

BRIGHTMIRE, Chief Judge.

It finally came to an end: The mother's forum-shopping effort in this child custody conflict. The end came when an Oklahoma district court finally called a Louisiana parish court and confirmed that the Oklahoma court did not have jurisdiction of the subject matter and that the children involved should be returned to Louisiana—the state whose courts had divorced the parents, provided for the custody of their children, and the state whose courts have found the mother guilty of contemptuously violating its custody order.

The order of the court below, which was issued after many months of delays and hear-ings, directed the mother to surrender the children to the custody of the Louisiana Department of Human Services on June 2, 1993.

The State appeals. Its extraordinary attack on the order is founded on this two-prong premise: (1) Neither the *Uniform Child Custody Jurisdiction Act,* (UCCJA), 43 O.S.1991 §§ 501 through 527, nor the *Parental Kidnapping Prevention Act,* (PKPA), 28 U.S.C. § 1738A, justify the dismissal of the State's action—quite apart from the question of whether the best interests of the children are served by the continuation of the Oklahoma action; and (2) the "best interests of the child" standard established in 43 O.S.1991 §§ 505(A)(3) and (D), control over other child protection statutes, inasmuch as it is the State, as distinguished from a parent, which is exercising protective power over subject children.

We hold neither contention has merit and affirm the trial court's order.

I

The background facts are these. In 1991, the then Debora Stonecipher, her husband, Robin Stonecipher and their two little girls, R.L.S. and C.E.S., lived in the State of Louisiana. On a date not disclosed by the record the mother sued her husband for a divorce. Then, on June 20, 1991, without dismissing the divorce action, the mother, as the father's lawyer was to later put it, went forum shopping in Oklahoma and began living in the City of Moore with her two minor children.

About a year later, on June 3, 1992, the Louisiana trial court granted the parties a divorce and, over the mother's objection, issued a *Joint Custody Implementation Plan* naming the father as the primary custodial parent of the two girls—R.L.S., then 5 years old and C.E.S., age 9. Other specifics of the plan included a call for the parties to work together in an effort to properly raise the children; and the granting of physical custody of the children to the father during the school year and to the mother during the summer months. The mother moved the

court to grant a new trial. The motion was denied July 20, 1992. It appears that the decree and custody plan became final.[1]

Eventually, the summer of 1992 came to an end. The mother failed to return the children to Louisiana as the Louisiana court had ordered. Instead, she went to the State of Oklahoma Department of Human Services and accused the children's father of having sexually abused them—an accusation she had not made in her Louisiana action. In other words, instead of bringing such a serious matter to the attention of the Louisiana court, or the Louisiana district attorney, or the Louisiana DHS, or appealing the Louisiana court judgment on that basis, she presumably decided to simply ignore it until the first custodial summer ended in Oklahoma. Or, as the father's counsel argued to the court on March 31, 1993, she "lost her action in Louisiana ... then tries to get Oklahoma to exercise jurisdiction, and that is classic forum shopping"—something that both the PKPA and the UCCJA were aimed at trying to stop.

The evidence, both direct and circumstantial, supports the father's position. It is undisputed that the mother ignored the Louisiana court judgment, waited until after the two girls had enrolled in school in Oklahoma, and then went to the Oklahoma DHS and enlisted its powerful forces to aid in her efforts to obstruct and defeat the custodial orders of the Louisiana court. She attained her objective, at least for many months, by the simple expedient of accusing the girls'

father of the serious crime of having molested them at some undisclosed time in the past. Her efforts, of course, bore fruit. For it came to pass that on September 15, 1992, the District Attorney of Cleveland County, at the behest of the DHS, filed an action in the district court seeking to have the two little girls declared deprived. The petition, sworn to by an assistant district attorney, alleged that:

> "[the] children do not have proper parental care or guardianship or whose home is an unfit place for the children by virtue of neglect, cruelty or depravity on the part of their *parents*. Specifically, the father, Robin Stonecipher, has sexually molested the above named minors on several occasions while said children were in his care." [2]

The record further shows that on that same day the clerk issued a "Juvenile Summons and Notice—Order to Appear" directed to "Robin Stonecipher, 107 Hazel Dr., Haynesville, LA 71038" notifying him that the "attached" petition was set for "arraignment" in the courtroom of Judge Alan J. Couch located at the "Alan J. Couch Center" in Norman, Oklahoma, on September 21, 1992, at 2:30 p.m., and ordering him to be present. This "summons" was issued the same day the petition was filed—September 15—and evidently mailed the same day because the affidavit of service contains a copy of a postal receipt [3] showing delivery to the father on September 21! The Oklahoma court failed to promptly contact the Louisiana court as re-

---

1. Following denial of her motion for new trial, the mother asked the Louisiana court for permission to file a "devolutive appeal." The record is silent as to whether the court granted such permission. Moreover, the mother treats the Louisiana divorce decree and subsequent custody-related orders entered by the Louisiana court as a final adjudication.

2. Emphasis added. The undisputed fact is that the DHS did not then and does not now, take the position that the mother had neglected subject children or, for that matter deprived them, since after the initial hearing it agreed that their custody should be placed with the mother and therefore it is apparent the district attorney knew or should have known that the allegations in the

first sentence were false. In this regard it is to be noted that there is no evidence that the father had visited with the children in Oklahoma. In fact there had not even been an allegation of abuse by the father in Oklahoma until several months later. Consequently, considerable doubt is cast on the propriety of the district attorney's second sentence.

3. For some reason the Cleveland County Court Clerk elected not to forward the original record to the appellate court as required by 12 O.S.1991 § 990, and Civil Appellate Procedure Rule 1.25, 12 O.S.1991 ch. 15, app. 2, and prepared and filed only a photocopy of the entire record.

quired by law.[4]

Nevertheless, a hearing was held on September 21. On that date the mother and the children signed documents [5] "admitting" the charges in the petition, waiving a separate disposition hearing, waiving a jury, and agreeing that the judge could combine the adjudication with the previous arraignment. Thereupon the court entered and wrote out in longhand a "Court Minute" which, the best we can tell, reads:

"All matter re father reset to Sept. 28, 1992 @ 3:00 p.m. Temp. order granting custody to mother is approved by agmt. Mother & children agree that children are deprived & they are wards of ct. Father has not stipulated. C"

By now the custodial train was moving right on down the non-jurisdictional track in Oklahoma with a full head of steam, with no apparent sign of a potential derailment. On September 22, 1992, an application for a temporary emergency custody hearing was filed along with an order, signed by the judge *the previous day*—September 21, 1992,—granting "temporary emergency custody" to the mother.

Three days later, on September 25, 1992, an "Adjudication Order as to the Mother and juveniles" was filed which recited what took place on September 21, 1992, and added this:

"The father, Robin Stonecipher, appeared not, but by counsel, Danny Lohman, Legal Intern, for Eric Hermanson [*sic*]. Arraignment and all other matters as to the father are continued to September 28, 1992, at 3:00 p.m."

**4.** *See* the Oklahoma Uniform Child Custody Jurisdiction Act, 43 O.S. §§ 501 through 527, discussed more fully later on.

**5.** The one signed by the two children discloses a signing date of "9–21–92" with a line drawn through it and above it is written "21" followed by "Oct" and "1992." Whoever made the changes, however, overlooked the fact that the document was filed September 22, 1992, the same date the mother's "E[lection of] R[ights]" form was filed.

**6.** Title 43 O.S.1991 § 508, reads in relevant part:

A State-paid counsel was appointed to represent the mother and another State-appointed counsel was assigned to appear for the children for the September 21, 1992, hearing. All parties, except the absent father, *stipulated* that the court should enter an "emergency" order adjudicating that the children were neglected and deprived, making them wards of the court, and placing temporary physical custody of them in their mother!

On October 1, 1992, the father undertook to protect his decretal and constitutional rights. His lawyer filed a motion for the Oklahoma court to defer to the jurisdiction of the Louisiana court pursuant to the provisions of our *Uniform Child Custody Jurisdiction Act* (UCCJA), and the *Parental Kidnapping Prevention Act* (PKPA). A show cause hearing was held on October 7, 1992, at which time, according to a "Journal Entry" filed November 10, 1992, the court ordered a continuation of the previous temporary custody order; directed the State to furnish the father's counsel with copies of all reports, tapes, or transcripts of interviews with respect to the abuse charges; directed the State to advise the Louisiana counterpart of our Child Welfare Services of this case so it could also investigate the abuse charges and, later on, the "alleged lesbian activities of the mother"; passed the case to November 4, 1992; and, finally, the document said that the "Court itself will initiate a call to the Judge of the Court of Claiborne Parish, Louisiana"—something the trial court was statutorily directed to do before exercising jurisdiction in the first place under the UCCJA,[6] but which, as we will see later, was not done until months later.

"A. A court of this state shall not exercise its jurisdiction under this act if at the time of filing the petition a proceeding concerning the custody of the child was pending in a court of another state exercising jurisdiction substantially in conformity with this act, unless the proceeding is stayed by the court of the other state because this state is a more appropriate forum or for other reasons.

"C. If the court is informed during the course of the proceeding that a proceeding concerning the custody of the child was pending in another state before the court assumed jurisdiction it

Incredibly, the record discloses that no complete evidentiary hearing had ever been held by the Oklahoma court with respect to the mother's molestation allegations, which means that not only was the father being deprived of a due process hearing on the allegations, but he was being deprived of his rights which had been duly established in a final judgment rendered by the Louisiana court in a lawsuit filed and prosecuted by the mother. The effect of this was that the judicial process in this state was being used to aid and abet a Louisiana litigant's violation of a valid Louisiana court order under the guise of protecting subject children from harm.

The record further shows that there was another hearing on November 4 which was continued until December 16, 1992. Nothing happened on either date except for the court to reaffirm its retention of jurisdiction, thus prolonging the mother's unlawful custody. More significantly, the record fails to disclose that the court had ever communicated with the Louisiana court as it said it would do weeks earlier.

Then, on January 14, 1993, a hearing on a contempt citation was held in the Louisiana court at which time the mother was present and represented by counsel. We have no record of that proceeding but it would certainly be difficult to believe that the mother would not have advanced the molestation allegations both as a defense to the contempt charge and as a reason for wanting to keep the children in Oklahoma and away from their father. Certainly there is no evidence in the record which even intimates that the Louisiana court is any less concerned about the welfare of subject children than the offi-cials and courts of Oklahoma. The fact is that the mother had an opportunity to be heard and, at the close of the evidence, the Louisiana court found her guilty of contempt of court in violating its orders, sentenced her to 30 days in jail, terminated her rights of visitation and custody of the two children, and ordered her to pay the father's attorney's fee and costs.

It is somewhat appalling to note that the very next day, January 15, the Cleveland County District Attorney's office swung into action—evidently realizing that a civil warrant for the recovery of the children would soon be issued—and, going beyond mere non-compliance with statutory law, began to wage an anticipatory counterattack aimed at affirmatively circumventing the expected enforcement order of the Louisiana court for the retrieval of subject children. The district attorney hastily filed what he called an "Application For Temporary Emergency Custody Hearing." The evident object was to thwart execution of the Louisiana order by removing custody of the two girls from their mother and placing them with the DHS, a state agency which could resist compliance with the Louisiana court order with impunity. On the same day the Cleveland County District Court—which, incidentally, still had never called the Louisiana judge—went along with the effort and entered an ex parte order granting the State's request, modified its previous order granting custody to the mother, placed custody of the children in the DHS and then, of course, granted it permission to leave the physical custody of the children with the mother, which it promptly did.[7]

This, then, clearly created the groundwork for a face-off between two states; the very

shall stay the proceeding and communicate with the court in which the other proceeding is pending to the end that the issue may be litigated in the more appropriate forum and that information be exchanged in accordance with Sections [5]21 through [5]24 of this act. If a court of this state has made a custody decree before being informed of a pending proceeding in a court of another state it shall immediately inform that court of the fact. * * *" (Emphasis added.)

7. There is no evidence that the father was permitted by the DHS to visit his children in Oklahoma. But based on certain statements and allegations made by the State in a petition requesting an emergency order, filed January 15, 1993,—the day after the Louisiana court issued its order for the children to be turned over to the father—one has to infer not only that there was visitation but that the State and the mother permitted unsupervised visitation. Why? Because the State alleged in its sworn-to application for an "emergency order" that the "father ... has repeatedly sexually and physically abused said

thing the PKPA and the UCCJA were designed to prevent. And, as will be more fully explained later, the cause of such an unfortunate state of affairs can be attributed directly to the trial court's failure to promptly comply with the requirements and intendments of the UCCJA and the PKPA when the matter first came before it four months earlier.[8]

On February 5, 1993, the Louisiana court signed a document memorializing its January 14, 1993, order. The order found that the children had not been returned to Louisiana as previously ordered, terminated the mother's custody of the children and her visitation rights, and issued a warrant commanding "Law Enforcement Personnel ... to obtain and return the minor children to the custody of the father ... immediately...."

The next significant event occurred on March 10, 1993, when the father's Oklahoma lawyer filed an application for a *Writ of Habeas Corpus,* which was issued. This time, perhaps because of the velocity the rapidly deteriorating situation appeared to be attaining, the Oklahoma judge did call the Louisiana judge. And, after talking to the Oklahoma judge, the Louisiana judge sent the former a memorializing letter dated April 6, 1993, in which he confirmed their conversation and added that based "upon the information you gave me that the proceedings in Oklahoma were filed September 15, 1992, it is my opinion that jurisdiction over the Stonecipher children lies in the State of Louisiana, since there was an earlier filing here."

That, however, did not immediately end the proceedings in Oklahoma. They continued until, at last, on April 21, 1993, the court entered a final order which is the subject of this appeal. It recited that the court had reviewed "the pleadings, briefs and other materials and reports filed herein [and there were several], [and] heard extensive argument of counsel" before making the following findings of fact and conclusions of law:

1. Jurisdiction for determining issues relating to the custody of subject minor children lies in the State of Louisiana—not Oklahoma—under the provisions of the UCCJA, 43 O.S.1991 §§ 501 et seq.

2. It is in the best interest of the children that they should be allowed to complete the current school year in the schools they are now attending, and that the temporary emergency order remain in effect until June 2, 1993.

3. The mother is to appear in this court with the minor children on June 2, 1993, at 9:00 a.m. to surrender custody of the children to the State of Louisiana Department of Human Services; or to such other person designated by the Louisiana court.

Orders implementing the foregoing followed.

But, alas, the children were not to be delivered as ordered. For on May 20, 1993, the DHS caused this appeal to be filed and on June 2, 1993, obtained an order staying the court's April 21 order pending the outcome of the appeal. The father timely filed a response.

children, in Louisiana *and in Cleveland County, Oklahoma."* (Emphasis added.) And so, under such circumstances, if the allegation is to be believed and the mother is trying to prevent a repeat of such alleged acts, one has to ask why the State and the mother apparently permitted unsupervised visitation by the father in Oklahoma which afforded him the opportunity to further allegedly molest his children!

8. By reaching the conclusion we have, we are not to be understood as being unconcerned about or indifferent to the welfare or best interests of the two minor children involved. On the contrary, it saddens this court to have the children find themselves the victims of such a legal tug of war—a predicament rife with serious potential consequences whichever way the matter is finally resolved. It is for this reason we find it regretta-

ble the law was not followed and enforced in the first place. And we remain convinced that the only means of damage control, or minimizing the damage at this point, is to urge that the parties be given an opportunity to have a full and complete hearing and resolution of the mother's charges in Louisiana as soon as possible. For it is the view of this court that the governing laws now on the books are good laws designed to prevent precisely what has happened here. Their belated enforcement in this state is regrettable. We are confident that Louisiana law forbids child molestation by parents or anyone else and we certainly have no reason to doubt that Louisiana's DHS and courts are not just as willing and capable of enforcing laws that protect children as the DHS and courts of this state.

It was at this point that the erstwhile celeritous district attorney's office for some reason suddenly experienced a rapid deceleration of activity in the case and, in fact became so lethargic that the supreme court had to threaten dismissal of its appeal before it would file a designation of record, and still later had to again threaten dismissal before the DA would file a supporting brief!

## II

■ The DHS's two propositions may be merged and reframed as follows: Neither the UCCJA nor the PKPA requires dismissal of the Oklahoma DHS action if "the best interests of the child are served by a continued extension of jurisdiction in Oklahoma," because the State, as distinguished from a parent, "exercises inherent and statutory protective powers over children living within" Oklahoma.

### A.

The argument is that the supreme court of this state—in construing the two acts referred to above—has said in *G.S. v. Ewing:* [9]

"An Oklahoma court, which renders a divorce decree, retains continuing jurisdiction to modify custody ... *if significant parental contact is maintained* and if one parent resides in Oklahoma."

So it follows, the argument goes, that the Cleveland County District Court had jurisdiction "[i]n the instant case, [because] *all* parental contact has ceased between the non-resident father in the original jurisdiction state, (Louisiana) because of the mother and children's absence since June of *1991,* **and** the father's alleged sexual abuse of the children." [10]

Quite aside from the fact that *Ewing* involved an Oklahoma divorce decree, it strikes us that for the State to advocate in the case at bar that Louisiana's original jurisdiction was lost under the circumstances simply because "significant" contact between the children and their father ceased for many months as a result of the mother's having spirited the children away to Oklahoma where, by lodging serious sexual abuse charges against the father, she set in motion proceedings designed to prevent him from being with his children—charges which she had not asserted in the divorce proceeding or reported to the Louisiana DHS—is akin to a figure skater claiming to be the legitimate champion after his friends and relatives conspire to break the knees of his chief rival. While it may be true that Mr. Stonecipher has not been permitted to visit his children for a long period of time, he has hired lawyers in two states and has spent a lot of time in court proceedings in an effort to be with his children.

We have examined the record rather carefully and have come to the conclusion that an inference may reasonably be drawn that the mother did indeed come to Oklahoma seeking a forum more amenable to her custodial desires and objectives than she evidently felt was available in Louisiana.

Nor have we seen anything in the record which justifies the criticism leveled at the Louisiana courts and all other officials of that sister state by the district attorney who, after complaining that they had not provided the Oklahoma DHS with "assurances, plans, or even representations ... concerning the future well being or protection of the two minor children in this case[,]" goes so far as to accuse them of having a "cavalier disregard for the heinous accusations made against the father" which the district attorney condemns as "alarming, to say the least." Such criticism is of concern to this court. For it is inconceivable to us, and we certainly do not believe, that either the Louisiana DHS or its courts condone parental abuse of children, sexual or otherwise. If indeed the Cleveland County District Attorney's office received less than an enthusiastic response from Louisiana officials, it just might be that

9. 786 P.2d 65, 68 (Okl.1990) (emphasis added).

10. The plain emphasis is the State's; the bold emphasis is added.

after checking into the matter the latter decided there probably had been no such abuse as alleged and that the allegations were likely manufactured to avoid compliance with the Louisiana court's custody order.

Certainly there is some support in the record for this possibility and that is that there is an indication that the matter may have been presented to a Louisiana grand jury. Whether this happened with negative results or whether the effort failed for lack of cooperation on the part of the mother is not disclosed. The fact is that there is no evidence that any indictment was ever returned or, for that matter, that the father has been given an opportunity to have a full evidentiary hearing on the mother's abuse charge during the many months that this matter has been pending in this state. It is also of concern that the district attorney refused to disclose to the father's attorney what evidence he had of the alleged abuse until he was finally ordered to do so not long before the final order was issued. The fact remains that the verity of what evidence there is—and there is not much—has never been subjected to the rigors of an adversarial trial. The ultimate effect of this is that the father's rights have been denied without due process of law.

### B.

The State's other argument is that in any event neither the UCCJA nor the PKPA require the shopped-for forum to dismiss an action if the continuation of its jurisdiction serves the best interests of the child, and that this is so because the State as distinguished from a parent, "exercises inherent and statutory protective powers over children living within" Oklahoma.

Here again the State begs the question and entirely misses the point of the statutes which, it agrees, apply to the existing situation. In a word, the point is that no basis for the court's exercise of jurisdiction to determine parental custody of the children has ever been shown. Indeed, the court's assumption of "emergency" jurisdiction for the temporary protection of the children from harm in September 1992 also appears to be without a valid foundation in that we can find nothing in the record to indicate that any emergency ever existed in Oklahoma which necessitated the need for court protection. The mother's accusations of abuse relate, for the most part, to what had allegedly happened in Louisiana before she came to Oklahoma. There is no evidence that the children were in danger of being molested by their father after arriving in Oklahoma.[11] If there had been, then, of course, the court had jurisdiction to provide for their protection while contacting the Louisiana court and making arrangements for their safe return to its jurisdiction and protection.

Before proceeding further it would be helpful to take a look at the applicable law. It is primarily statutory law and it is very clear. The first of the subject statutes is the *Uniform Child Custody Jurisdiction Act* which has been adopted in both Oklahoma and Louisiana. Among other things, 43 O.S. 1991 § 505, provides:

(1) Subparagraph A specifies that a court of this state which is competent to decide child custody matters, *has jurisdiction* to make an initial child custody determination or modification *if this state is the home state of* the child at the time of the commencement of the proceeding, or had been within six months before commencement of the proceeding;

(2) Subparagraph B states that physical presence in this state of the child or of the child and one of the contestants, "is not alone sufficient to confer jurisdiction on a court of this state to make a child custody determination," except under the provisions of "paragraphs 3 and 4 of subsection A." The exceptions under 3 are: "the child has been abandoned" or an "emergency" exists requiring judicial protection of the child "because he has been subjected to or threatened with mistreatment or

11. See footnote 7.

abuse or is otherwise neglected or dependent..." The exceptions under 4 are:

"It appears that no other state would have jurisdiction under prerequisites substantially in accordance with paragraphs 1, 2 or 3 of" subsection A, or another state has declined to exercise jurisdiction "*and* ... it is in the best interest of the child that this court assume jurisdiction." (Emphasis added.)

The foregoing state law is consistent with federal law both of which were fashioned to prevent the type of thing the mother and the DHS have done in this instance. The federal act reinforces the UCCJA by requiring every state to extend full faith and credit to the child custody determinations of sister states. Title 28 U.S.C. § 1738A [PKPA] reads in pertinent part as follows:

"(a) The appropriate authorities of every State shall enforce according to its terms, and shall not modify except as provided in subsection (f) of this section, any child custody determination made consistently with the provisions of this section by a court of another State.

.     .     .     .     .

"(f) A court of a State may modify a determination of the custody of the same child made by a court of another State, if—

(1) it has jurisdiction to make such a child custody determination; *and*

(2) the court of the other State no longer has jurisdiction to modify such determination." (Emphasis added.)

Here, the undisputed evidence shows that the only credible reason for the State's commencement of the juvenile court proceeding in Cleveland County on September 15, 1992, was to help the mother avoid compliance with the valid and subsisting custody order issued by the Louisiana court some three months earlier at a hearing attended by the mother in a divorce action she had filed. There was no showing whatsoever of any immediate threat of danger to subject children, and

certainly not in Oklahoma.[12] The only basis given by the State for invoking the jurisdiction of the Cleveland County court was the mother's allegation that at some unspecified time and manner in the past the father, who still resided in Louisiana, had sexually abused the girls. Thus, it was solely on the basis of such *allegations* that the State urged the court to take jurisdiction of the children's status and person, find that they were then and there deprived, and for their "protection" place their custody in the mother, thereby effectively removing them from the jurisdiction of the Louisiana court.

It is quite clear that under the undisputed facts in this case the trial court had no authority to do any more in September of 1992 than to inquire into its jurisdiction and, upon discovering that the mother was subject to an existing court custody order issued by a Louisiana court in a divorce action instituted by the mother, the Cleveland County judge had a statutory duty to recess and initiate contact with the Louisiana judge to verify the status of the case and the substance of his custody order, and determine whether the courts of Louisiana had any intention of declining to maintain and exercise jurisdiction with respect to any child custody issues the parties might raise in the case. And, upon finding that the Louisiana court intended to retain and exercise jurisdiction in the case, the Oklahoma court should have dismissed the proceedings for lack of jurisdiction and proceeded no further. The latest pronouncement of the supreme court of this state justifies the foregoing rationale and conclusion. In *Ewing* the court overruled *Breaux v. Mays,* 746 P.2d 708 (Okl.App.1987)—a case featuring operative facts similar to those in this case except for the fact that the court exercising original jurisdiction was in Oklahoma. The *Ewing* court said that the court of appeals erred in concluding that even though Oklahoma had entered the original custody order, it lost jurisdiction to modify its order because the children had been taken to another state which had become their "home state." Although not too relevant to

12. See footnote 7.

the factual situation in the case at bar, the high court also mentioned that some litigants had evidently been confused by "the distinction between initial and modification jurisdiction ... engendered to some extent by a misperception of" the supreme court's earlier holding in *State ex rel. Murphy v. Boudreau*, 653 P.2d 531 (Okl.1982), as well the *Breaux* opinion.

The rationale and holding of *Ewing* support the trial court's decision that jurisdiction of the subject matter in this lawsuit lies in Louisiana. Here the father continues to reside in Louisiana. The fact that he has had little or no contact with his children for many months was certainly not his idea or fault, but is attributed to the fact that the DHS has failed to provide him with any opportunity to exercise visitation—ostensibly because of the mother's molestation allegations.

The other statute cited by the State is the PKPA. Its paragraph (f) clearly provides that if a court has jurisdiction to make a child custody determination it may modify an earlier custody determination made by a court of another state, *if the other court no longer has jurisdiction or has declined to exercise its jurisdiction.*

The district attorney selectively ignores the significance of both the PKPA and the UCCJA, while stressing that the controlling element is that which serves the best interests of the child. Certain it is that though the welfare of the children is of paramount importance, its status is factually neutralized in the instant case because, as we have already said, the State's welfare concern is based on an allegation of past events which could have and, if valid, certainly should have been presented during the custody hearing in the Louisiana court. The most that can be said for the State's position is that it wants this court to ignore the plain language of both state and federal law and hold that only the court in Cleveland County is capable of determining what is best for the welfare of the children, which is another way of saying that the Louisiana · court is not. We, of

course, cannot subscribe to such a position for several reasons: First and foremost, it is contrary to the letter and the spirit of both statutory and decisional law; secondly, there is no evidence upon which such a subjective evaluation could reasonably rest; and thirdly, it would be fundamentally unfair to conclude without a trial either that the father is guilty of what the mother alleged, or that the Louisiana court is not willing and able to see that the best interest of subject children is served.

■ The State also contends that the best-interest-of-the-child standard controls here because the State has inherent and statutory protective powers over children living within its boundaries. The short answer to this is it begs the primary question of jurisdiction. While it is true that the best-interest standard is a controlling factor in determining how custody will be decided, it is not controlling in determining which state has jurisdiction of the controversy. *Application of Guthrie*, 792 P.2d 1197 (Okl.App.1990).

■ In *Holt v. District Court*, 626 P.2d 1336 (Okl.1981), the court made it clear that in determining whether there has been compliance with the provisions of jurisdiction under the Uniform Child Custody Jurisdiction Act, the first question to ask is whether the court has jurisdiction and, if so, the second question is whether it should be exercised. The supreme court noted that a court in this state can assume emergency jurisdiction to protect a child who is physically present and being subjected to abuse. At the same time, the court stressed that "emergency jurisdiction" is to be reserved for extraordinary circumstances and *"it must not be misused to defeat the purposes of the act...."* [13]

Here, Louisiana has never relinquished or refused to exercise its jurisdiction. Unquestionably, it has continued to exercise it even while the proceedings here were being conducted. There is no evidence that an emergency situation requiring the protection of subject children from harm in this state has

13. Emphasis added.

ever existed.[14] And, it has been held that without written notification that the sister-state court yields jurisdiction, Oklahoma must defer its jurisdiction under the Uniform Child Custody Jurisdiction Act. *Matter of C.A.D.*, 839 P.2d 165 (Okl.1992).

The state relies heavily on the holding in an unpublished opinion styled *In the Matter of Schuble, State of Oklahoma v. Schuble,* No. 70339, issued by Division Three of the Court of Appeals in March 1993. Though there are certain factual similarities between *Schuble* and the case at bar, the controlling facts differ so significantly that when the opinion is considered in its entirety it cannot be said that the result reached is inconsistent with the one we reach here today. Foremost among the dissimilarities are these: In *Schuble* the mother obtained a default divorce in Texas which granted her exclusive parental rights as "Managing Conservator" of the couple's children. She moved to Oklahoma. The opinion then states this: "Various matters, unnecessary to detail, caused the three children to be placed in counseling at Grand Lake Mental Health Center … A report of abuse of these girls was made to" the DHS and it investigated. There evidently was some kind of a proceeding commenced in Oklahoma because the father showed up, apparently with a "temporary" order of the Texas court issued October 29, 1987, which granted him temporary custody of two of the three girls and the mother temporary custody of the third one, saying that the mother had told him earlier she had dismissed the first action. He denied having ever abused the children and accused the mother of using the abuse allegations and counseling as tools to deprive him of his custody rights. On the same day the DHS is said to have received a phone call from a person with the Texas Children's Protective Services and a DHS person was permitted to testify concerning the information said to have been received which was that the girls had accused the father of physical, emotional, and sexual abuse; and that such allegations had not been presented to the trial judge who issued the temporary order. It was also significant that the Oklahoma judge tried and failed to get hold of the first Texas judge and subsequently assumed temporary emergency jurisdiction to provide protection for the children until arrangements could be made for the matter to be handled in Texas.

The *Schuble* case is therefore both factually and substantivally distinguishable.

### III

The order of the trial court is therefore sustained. The cause is remanded with directions to order the mother to immediately deliver the children to the father in Louisiana.

TAYLOR, P.J., concurs specially.

STUBBLEFIELD, J., concurs in result.

TAYLOR, Presiding Judge, specially concurring.

In this case I agree with most of the opinion of Brightmire, C.J. I agree that there has been an abuse of our judicial system and arrogance toward the institutions of our sister state of Louisiana by some of our officials and agencies. Unfortunately, the children will almost certainly be adversely affected by the unreasonable delays caused by their mother and this state's impediment to the proper implementation of the Uniform Child Custody Jurisdiction Act, 43 O.S.1991 §§ 501 through 527. The children should be delivered to their father immediately, regardless of whether or not they are in school.

STUBBLEFIELD, Judge, concurring in result.

I would affirm by summary opinion.

14. See footnote 7.